Our next case will be case number 21-236, United States v. Leib. Good morning, Your Honors. Good morning. May it please the Court. My name is Orlinda Johnson, and I represent the appellant Joshua Leib. Mr. Leib pled guilty without a benefit of a plea agreement in the District Court to one count of felon in possession of a firearm. He was sentenced to 100 months in custody. During the sentencing, the District Court erroneously enhanced Mr. Leib's sentence pursuant to 2K2.1b6b for possession of a firearm in connection with another felony offense. The felony offense that the District Court found gave rise or supported this enhancement was the New Mexico State offense of shooting at an occupied dwelling, which is contrary to New Mexico Statute Section 30-3-8. Now, while the application note 14 to Section 2K2.1b6b indicates that the enhancement is appropriate if the firearm has the potential of facilitating or facilitates the underlying felony offense. However, the enhancement requires that the District Court make specific factual findings that there was a nexus between the presence of a weapon and the underlying felony. With respect to your argument about findings, that's on plain error, right? Yes, no, Your Honor. Respectfully, this is... The findings is not on plain error? The findings would be... Just that component. If your contention is that the District Court erred in failing to make factual findings about the nexus for 2K2, that's on plain error. Your Honor, respectfully, I would disagree. I would submit to the court that it's for clear error. And because this issue was preserved before the... You asked the court to make findings and it refused? No, Your Honor. No, but the issue was preserved. I would submit to the court that the issue was preserved and it's at Volume 4 at 123, wherein counsel for Mr. Leib indicated to the District Court, I'm going to rely on some of this court's factual findings plus the complaint that was filed by the police officers in state court. The complaint that was filed in state court is what contained Mr. Leib's mother's statement that she believed he fired the gun into the floor of the home of his room. And I indicated to the court that I would submit to the court that these facts are not sufficient, even by a preponderance of the evidence standard to support this four-level enhancement. Okay. So that's different, though, than I think what Judge Rossman was saying. That's not saying that your findings are insufficient. That's an evidentiary insufficiency argument. I think there's a difference, and maybe your argument's not what we think it is. Well, Your Honor, I would submit to the court that the error is preserved at the District Court, as long as it allows the District Court to rule on the issue. Now, Judge Rossman is correct. I did not specifically ask the court to make specific factual findings that the facts on which the court was relying were sufficient to assess the enhancement. However, when the error is preserved, and I would cite to Yee v. City of Escondido, California, which was a 1992 U.S. Supreme Court decision. Does our court follow Yee? Your Honor, now I understand Yee is a civil case in which Mr. Yee raised an issue pursuant to the Fifth Amendment at the District Court, and then raised an additional issue before the appellate court. And the Supreme Court noted that once a claim is properly presented, a party can make any argument in support of that claim. Parties are not limited to the precise argument made below. Since it is U.S. Supreme Court precedent, I would submit to the court that this court would be bound to follow the Yee decision. And even if this court were to review that component of appellant's argument for plain error, I would submit to the court that we have established that the District Court plainly erred. Because pursuant to U.S. v. Ivey, the District Court was required to make specific factual findings. And in this case, it did not. And not only did it rely on Mrs. Live's hearsay statement, which was uncorroborated, it was not reliable because it contradicted all her previous statements. But you're relying, I mean, when you take the totality of what she said that night, you're relying on some of what she said and think that that's reliable, but then you're not relying on some of the other things she said because that's unreliable hearsay. Well, how I would answer that question is that she specifically, Mrs. Live, on numerous occasions, told the officers, my son may have shot himself. I think he's lying in there dead for all I know. And she said that on numerous occasions. But what makes those statements reliable is that when the officers eventually entered the room, one of the officers made an observation that he didn't see any impact, any bullet impacts in the room. So I would submit to the court that that tends to corroborate her statements that she was concerned that he was the intended target, not the home. Well, if that was the case, though, the bullets would have been in him. I mean, the fact that the officer didn't see any bullet holes in the wall. And I think the testimony was not that the officer was, like, scouring the floor to see if there were any bullet holes in the floor, right? That's correct, Your Honor. The testimony was more directed to looking at the walls and the ceiling? The officer testified to, and that's at Volume 4 at 36 and Volume 2 at 77, line 6, that he did not see any bullet impacts. And you're right, they were concerned with whether or not Mr. Live had shot himself. And pursuant to State v. Comets, New Mexico State Supreme Court case that addresses this specific statute, there has to be specific evidence that the intended target was the dwelling. It cannot just be coincidental that he fired a gun inside the dwelling. But isn't the fact that there were three shots that hit the floor evidence enough of the intent to hit the building, I mean, the house? One shot could have just been an accidental squeeze of the trigger, but three shots kind of indicates, you know, that's what the guy intended to do. Your Honor, there was no evidence before the district court that he actually fired into the floor, other than Mrs. Live's passing statement when the officers were leaving. There were no casings found. There were no bullet impacts found in the home. So there was not sufficient evidence for the court to make the determination. And, in fact, this case is almost identical to United States v. Fennell, in which this court rejected Mr. Fennell's girlfriend's statement that Mr. Fennell fired the gun at her. Now, there was evidence that Mr. Fennell had fired his weapon, but there was no evidence that, other than the girlfriend's statement, that he had fired the weapon at her. You're not challenging that there's sufficient evidence to support that the gun was fired? Your Honor, I think that there was sufficient evidence because of Mrs. Live's repeated statements. There was a neighborhood call 911 that there was a discharge of a firearm. Whether it was two shots, three shots, that was not clear. Was the statement, though, multiple shots, or was the statement just, I heard a firearm? Multiple shots, Your Honor. Okay. And the district court's factual findings in its memorandum opinion and order denying the defendant's motion to suppress actually contradict the district court's reliance on Mrs. Live's statement that he must have fired into the floor. Is it a contradiction, or is it just that, at that stage, the court was focused more on the suppression issue and not on the specifics of 2K2? I don't see the contradiction, but I'd like you to explain why I'm wrong. Well, it may be, Your Honor, that the court was focused on making its factual findings, but that would have been an important factual finding to make, that there was also the statement by Mrs. Live that he fired into the floor, because all of the district court's factual findings, on the record, indicate that Mrs. Live was concerned with Mr. Live having shot himself, that he could be lying in there dead, and, in fact, that was one of the basis for the district court's finding that the officers were justified in entering the room. And so it is a contradiction, because when you look at the court's factual findings in its memorandum opinion and order, and then you look at the district court's reliance on one statement, which was not testified to by any of the officers, there was no testimony from the officers, and, in fact, not observing bullet impacts tends to contradict the statement that he fired into the floor. I mean, especially considering that we're on plain air review, aren't some things self-evident from the record? So you have the police enter the room based on a concern that he might be trying to harm himself or commit suicide with the gun, and he's alive, there are no bullet holes in the wall, the bullets had to have been fired somewhere, everybody agrees that the shots were fired, and, you know, just because there was no specific finding that the officers scoured the floor and found bullet holes, I mean, it seems at some point it's sort of self-proving that the inference is reasonable that the shots were fired into the floor. Your Honor, that would be contrary to New Mexico jurisprudence that has analyzed and interpreted the shooting at an occupied dwelling case law, for example, State v. Comets. Mr. Comets and his associates were engaged in a dispute with other individuals on a front porch of a home. A fight ensued, Mr. Comets fired at the individuals and ended up firing at the home, and he was, the New Mexico Supreme Court vacated his conviction. That was different, because there was evidence that he fired at something other than the home, firing at these other individuals. In this case, there is no other object of the firing that enters the factual analysis whatsoever. I mean, he even denied being suicidal. That's true, but the evidence before the court is insufficient to rely on or to reach the conclusion that the intended target of the shooting was the dwelling. And New Mexico jurisprudence requires that it be knowingly and intentional that the intended target was the dwelling. Well, we have the three shots indicating that it wasn't an accidental squeezing of the trigger. That probably gets rid of your lack of intentionality. Then the question is, fired at what? And every other option is excluded. Not fired at himself, not fired at the walls, not fired anywhere else. And so there was, and then you later discovered by the testimony of the mother that the bullet holes in the floor, that's the only other option, isn't it? Your Honor, that there was, you're right, he did, Mrs. Leib stated that he would, she did not think he was suicidal. But actually, government counsel during the sentencing referenced that post-indictment, Mr. Leib attempted to commit suicide several times during the pendency of his case. So this would tend to corroborate Mrs. Leib's concern when the officers arrived that he may have tried to commit suicide. He just missed. Right, right, but that's, okay, never mind. You have to have. He missed three times. He could have missed three times. Now, Mrs. Leib is the only person who stated the number. She indicated three times he must have fired into the floor three times. We have to remember that New Mexico Supreme Court requires specific evidence or evidence that he intended. So it's intentional. You have to show that he intentionally fired at the dwelling. Do the burdens of proof that apply under New Mexico law, you know, for the actual criminal conviction, we have a different burden here, right? The government's burden is the preponderance. So does that affect your analysis at all? Not necessarily. I mean, obviously, you have beyond a reasonable doubt is the burden of proof for a conviction. Here we have a preponderance of the evidence, but you still have to have some evidence. And a hearsay statement that is contradicted, and I would respectfully submit it is contradicted, by all of the other factual findings and all of the other evidence before the district court, even Mr. Leib's attempted suicide incidents during the pendency of the case, contradict that the intended target was the dwelling. Respectfully, Your Honor, even if the court were to review this for plan error, I would submit to the court that there was not sufficient findings and this sentence must be reversed. Thank you, Counsel. Good morning again, Your Honors. Emil Keeney for the United States. I want to, there are a lot of questions there, so I'll try to address them, the ones I remember. The first, I think one of the most important ones is whether this case is like Fennell or not, whether it was proper for the district court to rely on the hearsay, whether there's sufficient indicia of reliability for the hearsay statement. And I think there was. In Fennell, what you had is the enhancement, the district court relied essentially solely on the girlfriend's statement that a gun had been fired at her. And what this court said is, well, you know, this is a statement contained in an officer's affidavit. We don't know that, and it was an affidavit taken over the telephone, so he didn't know this woman. He didn't have a chance to evaluate her credibility. There's no reason to think that this report was reliable and that, therefore, there's no indicia of reliability. Here, I think the district court had reason to think that Mrs. Leib was, there were at least some indicia of reliability for her statement. Her, the officers did have an opportunity to evaluate her. They spoke with her in person. She reported three gunshots, and that was corroborated by a neighbor to the extent that police, you'll see in Exhibit B, which is on a disc, it's a lapel camera video that we submitted as a supplement. About, I think, three minutes in or so, there's a police officer talks with one of the neighbors who isn't able to identify it as a gunshot, but she says, we heard a loud noise. So I think the district court could reasonably consider that as corroborating Mrs. Leib's reliability. She said, he's in the room, my son is in a room with a gun, I heard gunshots. They go in, they find him with a gun laying nearby, and they're spent bullet casings. Did she say, I heard gunshots? She did. Plural.  That's on one of the tapes. At some point she said three, but in that first statement, she used the word plural on that. I mean, does the transcript show that I heard gunshots? I think she did. I'm sorry, I don't remember that exactly. But at one point she does tell them, I heard three gunshots. I know that she got around to saying three, yes. Yes, that's correct. They find spent bullet casings inside the revolver, which indicates that it has been fired. And then you'll see on the videotape, she has an opportunity to observe inside the room. She's standing near the doorway with one of the officers. We think there's sufficient indicia of reliability. We don't think that there's any... Moving on to the issue of the contradiction. We don't think any contradiction exists between her statements on the video. There's actually no testimony in this case. Because there was a guilty plea, and what the district court is lying on is the videotapes of the encounter that were submitted into evidence. At the time that Mrs. Leib is making the statements to the police officers, I think my son might have hurt himself. She hasn't seen what went on. She tells the officers he was upset earlier in the day. He's been upset all day, in fact. And he went in there, I didn't know he had a gun, and he heard gunshots. So she is thinking the worst. But she doesn't know that. Then later on, when they find out that he is okay, that's when she's near the door and says, well, he fired into the floor. And how does that resolve in favor of the government for understanding the requirement of the New Mexico statute that your opposing counsel was describing, that the intended target had to be the dwelling? How do these conflicts seem in conflict? First she thinks he hurt himself, may have hurt himself. Then after she sees, maybe she says something else. But how does that totality support the government on the statute? The New Mexico statute. Well, because when they find later on, at first she thinks one thing. She's surmising. But then she finds out later that that isn't, her worst fears have not been lived out. Your son is alive, but he's shot into the floor. How does that go to intent? Well, because I think if it were one shot, I think we'd have a hard time proving intent, Your Honor. Because it could be an accidental discharge or negligent discharge. But when you fire a gun three times, I think at least the district court is entitled to infer that it was an intentional act. So that's what we would rely on there. So intentional discharge, okay, fair enough on that. Then the next thing that you have to have, though, is, I mean, you have to intend to hit the dwelling. Right. What's the evidence on that intent? Well, I think the district court is entitled to infer that he's shooting repeatedly at the same place, which is a part of the house. And therefore, he intended to hit that as opposed to something else. Now, is it possible that he intended to commit suicide and he's just a really bad shot? I mean, I suppose the district court might have been able to draw that inference, too. But I think the district court, it wasn't outlined. What is odd about this case is I'm sure that when the drafters of this statute made it illegal to fire a building, the last thing they had in mind was somebody firing a bullet inside the building at the floor. You know, this was intended for drive-by shootings. And it's just, maybe you can get the square peg into the round hole, but it certainly is a pretty unusual application of this statute. I see what you're saying, Your Honor. I think what I would say to that is, first of all, New Mexico doesn't have legislative history. And that, indeed, may have been the primary intent of the legislature subjectively in enacting the statute. But the language of the statute is broader than that. We don't have any case law or language in the statute limiting it to shootings coming from outside the house. And that's not a claim that defendant is even making. I understand. It's just a bizarre set of facts for the statute. It's not the usual case. I agree with that. Yeah, I mean, so we really are working off of inferences in the case. Because the actual evidence we have is three shots fired, no injury to the person who fired them, and a declaration by the person that they weren't suicidal at the time. And no evidence of bullet holes in the wall. Right. And no evidence of bullet holes in the wall. So the next, so we're based on that. And then we have a hearsay statement of something about three shots into the floor. And so based on that, we're left to conclude that that's the only option, in essence. Is that fair? Yes. Okay. I think I agree with that. But in that scenario, nobody really discussed, at least I don't remember anybody discussing, the possibility that there could have been an open window and the shots went out the open window. I don't recall a discussion about that possibility. It probably is in there, and I didn't go back to look at the record on this one. But is that a possibility? Was that discussed at all by anybody? It was not discussed. But I think if you look at the video, and I'm not sure it's 100% clear, but there's a sheet. And there may have been, I think one of the claims was that the officers improperly opened the window during the suppression hearing to look into the room. So I don't think there was any discussion of that. So I think that's one of the reasons we would rely on the mother's statement that they were into the floor. Yeah. So that statement, it turns out to be kind of critical if in fact there was an open window. But if an officer opened the window, you don't know whether the window would have been shut by the defendant after he fired the shots. I don't know if he opened the physical window, but there was either some kind of blinds or a sheet hanging in front of it that he had to move. I know the window didn't enter into the conversation, but I was thinking of all the other options that might have to be disproven. But, of course, the officer doesn't have to prove this beyond a reasonable doubt. That's not the standard. So even if there was a window, I don't suppose that would make much of a difference. But I'm curious about it. No, the parties didn't discuss it, and I think there's enough there. I think, yes, we do rely on the mom's statement. In that sense, it is a necessary statement for us. Oh, I wanted to say, I think I said earlier in this argument something that wasn't precisely correct that's just come to mind. I said there's no testimony in the case. There's no testimony at the sentencing hearing, but there had been testimony obviously at the suppression hearing. I just wasn't thinking of it. The district court, I think, relied on some of that at the hearing. What supports the assertion in the government's answering brief that Mrs. Leib evidently noticed bullet holes in the floor? Well, I think that's based on, if you look at the video, she's there in front of the door, and then she says that. That's all that I meant to refer to. Okay, but because there's no sight, so that's not actually ever said. She doesn't say, look, I see them. No, she says, he shot into the floor. He shot into the floor. Right. But the evidently noticed bullet holes in the floor is the government connecting the video. That is, yes. That's my connection, and it's not something she specifically said. Understood. Thank you. The other thing I wanted to address just at the end is just the scope of our plain error objection. I mean, normally we're very, government's very, we like the plain error rule in a lot of contexts. The only context in which I asserted it, though, in my brief, is that to the defendant's argument that the reliance on the mother's statement was improper because it was unreliable hearsay. I didn't intend to suggest that she's waived her entire claim for that. I understood that as more of an evidentiary objection, saying it was legally improper to do so. So I just want to make that clear to you all. Unless the court has any other questions, we would ask that you affirm the sentencing enhancement. And thank you very much. Thank you, counsel. The case will be submitted, and counselors, please, thank you both for your good arguments today.